# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRENCE HOLMES, | : | Civil No. 3:17-CV-01567 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PA DEPT. OF CORRECTIONS, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Plaintiff's amended complaint raises claims under 42 U.S.C. § 1983 against Defendants alleging that his Eighth Amendment rights were violated when his kidney disorder and left nipple discharge went untreated.  (Doc. 15.)  Defendants filed a motion for summary judgment on all claims.  (Doc. 59.)  For the reasons discussed below, the court will grant Defendants' motion, enter judgment in favor of Defendants, and close the case.

## PROCEDURAL HISTORY

Terrence Holmes ("Plaintiff"), an inmate previously housed at the State Correctional Institution in Camp Hill, Pennsylvania ("SCI-Camp Hill")[1], initiated this action by filing a complaint pursuant to 42 U.S.C. § 1983 in September of 2017.  (Doc. 1.)  The complaint named four Defendants: (1) Nicole Boguslaw ("Boguslaw"), Physician Assistant at SCI-Coal Township; (2) Thomas McGinley,

---

[1] Plaintiff is currently housed at SCI-Laurel Highlands in Somerset, Pennsylvania.  (Doc. 12.)

Facility Manager at SCI-Coal Township, Warden of MCCF; (3) Dr. Michael

Moclock ("Moclock"), Medical Direct at SCI-Coal Township; and (4) Karen

Merritt-Scully, Corrections Health Care Administrator.  (Doc. 1, pp. 2, 6.)[2]

Plaintiff also raised a medical negligence claim against Defendants.  (*Id*.)  On

March 20, 2019, the court screened the complaint pursuant to 28 U.S.C. §

1915(e)(2)(B)(ii)[3], dismissed the complaint without prejudice, and granted Plaintiff

leave to amend the complaint.  (Doc. 11.)

Plaintiff timely filed an amended complaint on May 9, 2019.  (Doc. 15.)

The amended complaint names three Defendants: (1) the Pennsylvania Department

of Corrections ("DOC"); (2) Boguslaw; and (3) Moclock.  (*Id*., p. 1.)  In the

amended complaint, Plaintiff reframes his claims as Eighth Amendment claims for

inadequate medical treatment of his kidney disease and his left nipple.  (*Id*., pp. 5–

7.)  On May 15, 2019, the court screened the complaint pursuant to

1915(e)(2)(B)(ii), dismissed the DOC as a defendant, and ordered Defendants

Boguslaw and Moclock be sent a copy of the complaint and waiver of service

forms.  (Doc. 16.)  Defendants Boguslaw and Moclock returned their waiver of

service forms on June 11, 2019.  (Doc. 20.)

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[3] Plaintiff was granted *in forma pauperis* status under 28 U.S.C. § 1915 on March 20, 2019.
(Doc. 11.)

On July 15, 2019, Defendants filed a joint motion to dismiss and for summary judgment.  (Docs. 21, 22.)  Following briefing, the court granted Defendants' motion and entered judgment in favor of Defendants on July 17, 2020.  (Docs. 37, 38, 39.)  On August 14, 2020, Plaintiff filed a motion for reconsideration and brief in support.  (Docs. 40, 41.)  On March 30, 2021, the court ordered Defendants to respond to Plaintiff's motion for reconsideration.  (Doc. 42.)  Defendants failed to timely respond, and the court entered an order grating the motion in part on September 30, 2021.  (Doc. 44.)  In doing so, the court vacated the July 17, 2020 order, granted Defendant's motion for summary judgment as to the Eighth Amendment claim for inadequate medical treatment of the kidney disease, and denied Defendant's motion for summary judgment as to the Eighth Amendment claim for inadequate medical treatment of the left nipple discharge.  (*Id.*, p. 7.)

Defendants then entered an answer to the surviving Eighth Amendment claim.  (Doc. 45.)  Following discovery, Defendants filed a motion for summary judgment on the remaining Eighth Amendment for inadequate medical treatment of Plaintiff's left nipple discharge.  (Doc. 59.)  Plaintiff filed a brief in opposition, and Defendants filed a reply.  (Docs. 73, 74.)  Therefore, the motion is now ripe to be addressed by the court.

## JURISDICTION AND VENUE

The court has jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States. Venue is proper in this district because the alleged acts and omissions giving rise to the claims occurred at SCI-Coal Township[4] in Northumberland County, which is located within this district. *See* 28 U.S.C. § 118(b).

## MOTION FOR SUMMARY JUDGMENT STANDARD

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

---

[4] Defendant's statement of facts alleges that during the relevant period Plaintiff was housed at SCI-Houtzdale. (Doc. 61, p. 2.) However, the medical records attached to the brief in support demonstrate that Plaintiff was treated at SCI-Coal Township. (Doc. 60-1.) Therefore, the court deems the citation to SCI-Houtzdale is scrivener's error.

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

**A. Defendants' Motion for Summary Judgment Will be Granted.**

**1. Medical Records Concerning Plaintiff's Left Nipple Discharge While Housed at SCI-Coal Township**

On June 22, 2015, Defendant Boguslaw saw Plaintiff, who was complaining of dark red discharge from his left nipple for the past two weeks, and the discharge had changed to dark brown. (Doc. 60-1, p. 1699.) Examination revealed minute dark brown discharge from the left nipple, no nipple retraction, no palpable chest masses, no axillary lymphadenopathy, no tenderness, and no dimpling. (*Id*.) He was diagnosed with nipple chaffing and instructed to leave the area alone and keep it clean and dry. (*Id*.) The treatment note then refers to "See orders." (*Id*.) That same date, Defendant Boguslaw ordered multiple blood tests. (*Id*., p. 1631.) On

June 24, 2015, these blood tests were drawn.  (*Id*., pp. 40, 305.)  The results were reported on June 26, 2015, and all hormone tests demonstrated normal values.  (*Id*., p. 305.)

The next time Plaintiff sought medical treatment regarding his left nipple was on August 30, 2017, when he presented to triage with left nipple drainage that had been occurring for the last hour.  (*Id*., 1659.)  The same day Dr. Monsalud, treated Plaintiff, and an examination showed discharge when breast tissue, not the nipple, was squeezed.  (*Id*.)  Dr. Monsalud ordered blood work to test Plaintiff's prolactin levels and instructed Plaintiff to follow up when results were available. (*Id*., 1660.)  The blood was drawn on September 1, 2017.  (*Id*., pp. 37, 223, 1660.) The results were reported on September 2, 2017, demonstrating a high value of 33.38 ng/ml.  (*Id*., pp. 223, 1657.)  Laboratory Reports list a reference range of 3.7 to 17.9 ng/ml.  (*Id*.)  On September 7, 2017, Defendant Moclock reviewed the results and stated that Plaintiff should be seen within seven days.  (*Id*., p. 224.)

On September 6, 2017, Defendant Moclock treated Plaintiff.  (*Id*., 1660.) He noted that Plaintiff's breast appeared normal on exam, but one drop of dark brown blood was expressed from the left nipple.  (*Id*.)  He ordered an ultrasound of the left breast.  (*Id*.)

A second blood draw to test prolactin was done on September 8, 2017.  (*Id*., p. 1659.)  The report showed a prolactin level of 36.10 ng/ml.  (*Id*., pp. 221, 1657.)

Defendant Moclock saw Plaintiff via telemedicine on September 11, 2017. (*Id*., 1657.)  He noted that the prolactin tests were high and instructed Plaintiff to follow up in four to six weeks.  (*Id*.)  Defendant Moclock stated that "chronic renal failure can lead to hyperprolactinemia due to reduced cleanliness; stress reaction can mildly elevate prolactin."  (*Id*.)  He again ordered an ultrasound of the left breast.  (*Id*.)

The ultrasound of the left breast was completed on September 12, 2017. (Doc. 60-1, p. 1658; Doc. 60-2, p. 2.)  The ultrasound showed a "[m]ild benign appearing bilateral gynecomastia, slightly greater on the left.  No sonographically suspicious findings, ductal dilation or worrisome acoustic shadowing."  (Doc. 60-2, p. 2.)

On September 20, 2017, Dr. Monsalud saw Plaintiff in the Chronic Clinic for hypertension and dyslipidemia.  (Doc. 60-1, pp. 1655–56.)  Plaintiff complained of itching in the left breast.  (*Id*., p. 1656.)  Dr. Monsalud requested a follow up in six months.  (*Id*., p. 1655.)  However, on September 22, 2017, Dr. Monsalud presented Plaintiff's case to the management team, discussed the nipple discharge, and approved him for a surgical consult.  (*Id*., p. 1654.)  Defendant Moclock wrote a request for a surgical evaluation on the same date including the following statement: "Patient with 1 yr. history of hemorrhagic discharge from the

left breast.  Condition has worsened over last 30 days.  Ultrasound of breast is negative.  Surgical evaluation approved by UM on 9/22/17."  (*Id*., p. 989.)

On September 26, 2017, Defendant Moclock and Plaintiff discussed probable cause of the prolactin levels, and Defendant Moclock stated he would continue to monitor it.  (Doc. 60-1, p. 1654.)  He further stated that Plaintiff was awaiting surgical consult.  (*Id*.)

On October 2, 2017, Defendant Boguslaw completed a physical in advance of his nephrology consult.  (*Id*., p. 868–69, 1654.)

On October 12, 2017, Defendant Moclock ordered a repeat ultrasound of the left breast at the request of the consulting surgeon on advance of his November 1, 2017 appointment.  (*Id*., 984–85.)  The second ultrasound was completed on October 18, 2017 along with a diagnostic bilateral mammogram by Dr. Scott who stated that "[f]indings are probably benign.  A short interval follow-up mammogram/ultrasound is recommended in 6 months to ensure stability, unless more aggressive treatment, including biopsy is clinically warranted."  (Doc. 60-2, p. 4.)  In the treatment note, Dr. Scott represented Plaintiff's history as "[f]irst noticed spotting of blood on shirt above left nipple a year ago.  About a month ago noticed quarter sized spot of blood again on shirt above left nipple. . . ."  (*Id*., p. 5.)

On November 1, 2017, Plaintiff was seen by Drs. Dudash and Arora at Geisinger Medical Center ("Geisinger"), who entered a plan for Plaintiff to

undergo a ductogram and ultrasound guided biopsy of his left breast.  (Doc. 60-2, pp. 5–9.)  Thereafter, Dr. Monsalud referred Plaintiff for the oncology consult, including the core needle biopsy and ductography.  (Doc. 60-1, pp. 978–79.)

On November 7, 2017, Dr. Monsalud saw Plaintiff for a follow-up from the ultrasound, and she told Plaintiff that additional consults had been approved and they were waiting for the appointments to be scheduled.  (*Id*., p. 1651.)

On November 14, 2017, Plaintiff underwent a ductogram, which showed subareolar ducts were opacified, but not particularly distended.  (Doc. 60-2, pp. 10–12.)  He also underwent a targeted sonogram of the left breast which was compared to the previous tests/imaging reports.  (*Id*.)  The report showed that that no lesion was seen on the sonogram, therefore, no biopsy was performed.  (*Id*.)  He also had additional blood work drawn.  (Doc. 60-1, p. 1651.)

On November 15, 2017, Dr. Moclock ordered additional consults beginning with an MRI of both breast, which was recommended by the oncologist.  (*Id*., pp. 972–77.)  He further wrote that Plaintiff had a "1 yr history of intermittent hemorrhagic left nipple discharge.  Over last couple of months discharge became markedly worse."  (*Id*., p. 974–75.)

On November 17, 2017, Defendant Boguslaw noted that Plaintiff's MRI and nephrology physical were completed.  (Doc. 60-1, p. 1651.)

On November 27, 2017, it is noted that Plaintiff's MRI was canceled because the machine was not working.  (*Id.*)

On December 1, 2017, Dr. Moclock reviewed Plaintiff's chart notes from Geisinger.  (*Id.*, p. 1652.)  He noted that no malignity had been found, but Plaintiff was scheduled for an MRI and an excision would probably be performed.  (*Id.*)  Dr. Moclock stated that he made Plaintiff aware of this.  (*Id.*)  Dr. Moclock saw Plaintiff again on December 4, 2017 for nephrology telemedicine follow-up.  (*Id.*, pp. 856–57, 858–89.)  On December 6, 2017, Plaintiff had additional blood work drawn.  (*Id.*, p. 855.)

On December 11, 2017, Plaintiff returned to Geisinger for his MRI, which showed "no suspicious findings [were] seen," and the impression was gynecomastia without MRI evidence of malignancy with clinical management recommended for nipple discharge."  (Doc. 60-2, pp. 12–13.)

On December 13, 2017, Plaintiff was seen by a surgeon at Geisinger.  (Doc. 60-2, pp.14–19.)  Plaintiff reported that he had been experiencing left nipple discharge for one year and eleven months.  The surgeon recommended a central duct excision to rule out cancerous process.  (*Id.*)

On December 14, 2017, Dr. Moclock referred Plaintiff for a one-day surgery at Geisinger, and Dr. Miceli signed the referral on the same date.  (Doc. 60-1, pp. 968–69.)

On December 26, 2017, Dr. Monsalud saw Plaintiff for a surgery and ophthalmology consultant.  Plaintiff agreed to surgery.  (*Id*., p. 847.)

On January 4, 2018, Plaintiff had additional blood work drawn.  (*Id*., p. 846.)

On January 5, 2018, Defendant Moclock was updated regarding Plaintiff's creatinine level of 8.44.  (*Id*., 845.)

On January 30, 2018, Plaintiff was seen at Geisinger for his breast biopsy. (*Id*., p. 831.)

On February 6, 2018, Defendant Moclock saw Plaintiff upon his return from Geiser for surgery.  (*Id*., p. 822.)

On February 8, 2018, Plaintiff was transferred from SCI-Coal Township to SCI-Laurel Highlands, and Defendants' treatment of Plaintiff ended.  (*Id*., pp. 802, 1650.)

Following the transfer, the biopsy of the left breast revealed a ductal carcinoma in situ, and Plaintiff was referred for surgical evaluation for left mastectomy.  (*Id*., pp. 958–59.)

## 2.  Medical Records Between June 22, 2015 and August 30, 2017[5]

Plaintiff sought treatment repeatedly from June 2015 through August of 2017, but did not report continued discharge from the left nipple.  Instead, he was treated for hypertension, dyslipidemia, and kidney/renal problems.

On July 22, 2015, Plaintiff was treated for his renal problems and high blood pressure.  (Doc. 60-1, p. 1698.)

On October 5, 2015, Plaintiff had blood work drawn.  (*Id*., p. 1696.)

On October 9, 2015, Plaintiff was treated for eczema.  (*Id*.)

On October 13, 2015, Plaintiff had a renal ultrasound.  (*Id*.)

On October 19, 2015, Plaintiff no showed for his sick call.  (*Id*.)

On October 20, 2015, Brian Davis, PA-C completed Plaintiff's nephrology paperwork.  (*Id*.)

On November 13, 2015 Plaintiff had a telemedicine appointment with nephrology.  (*Id*., p. 1696.)

On November 24, 2015, Plaintiff was treated for his renal problems, high blood pressure, and mild anemia.  (*Id*., p. 1697.)  This was reviewed by Defendant Moclock on December 21, 2015.  (*Id*.)

On December 1, 2015, Plaintiff had blood work drawn.  (*Id*., p. 1695.)

---

[5] Plaintiff was also treated for cataracts during this period, but these were omitted from the summary as unrelated to this civil action.  (Doc. 60-1.)

On December 31, 2015, Plaintiff was seen in Chronic Clinics for hypertension and dyslipidemia.  (*Id*., p. 1693–94.)

On January 12, 2016, Plaintiff no showed for labs.  (*Id*., p. 1692.)

On January 25, 2016, Plaintiff was seen for his chronic kidney disease.  (*Id*.)

On January 26, 2016, Plaintiff had bloodwork drawn.  (*Id*.)

On February 2, 2016, Defendant Moclock saw Plaintiff for his chronic renal failure, stating that Plaintiff was stable and that he would continue to monitor him. (*Id*.)

On February 9, 2016, Defendant Moclock saw Plaintiff for his chronic kidney disease.  (*Id*., pp. 1691–92.)

On April 7, 2016, Defendant Boguslaw saw Plaintiff, reviewed his labs, noted decreased kidney function, and instructed him to follow up with nephrology. (*Id*., p. 1691.)

On April 19, 2016, Defendant Boguslaw completed nephrology paperwork. (*Id*.)

On April 22, 2016, Plaintiff had bloodwork drawn.  (*Id*.)

On May 10, 2016, Plaintiff's telemedicine was canceled due to lockdown, but "will reschedule" was noted.  (*Id*.)

On May 13, 2016, Plaintiff had bloodwork drawn.  (*Id*.)

On May 16, 2016, Plaintiff was seen for a lab review and was instructed to follow up with nephrology.  (*Id*., p. 1690.)

On May 17, 2016, Defendant Moclock saw Plaintiff for his chronic kidney disease.  (*Id*.)

On June 3, 2016, Plaintiff had bloodwork drawn.  (*Id*.)  On the same date, Defendant Boguslaw treated Plaintiff for dermatitis.  (*Id*., p. 1689.)

On June 6, 2016, Defendant Boguslaw saw Plaintiff for bruising due to the blood draw.  (*Id*.)

On June 17, 2016, Defendant Moclock treated Plaintiff, discussed consult recommendations, and told Plaintiff to continue to monitor symptoms.  (*Id*.)

On June 27, 2016, Plaintiff's treatment at chronic clinic was canceled due to lockdown.  (*Id*.)

On June 30, 2016, Plaintiff was seen in Chronic Clinics for hypertension and dyslipidemia.  (*Id*., pp. 1687–88.)

On July 5, 2016, Plaintiff had additional bloodwork drawn.  (*Id*., p. 1686.)

On July 15, 2016 Plaintiff was treated by Defendant Moclock for his chronic kidney disease.  (*Id*.)

On August 1, 2016, Plaintiff had bloodwork drawn.  (*Id*.)

On August 5, 2016, Plaintiff no showed for his psychiatric appointment. (*Id*.)

On August 9, 2016, August 16, 2016, and August 23, 2016, Plaintiff had bloodwork drawn.  (*Id*., pp. 1685–86.)

On October 10, 2016, Plaintiff was treated by Defendant Boguslaw for his chronic kidney disease.  (*Id*., p. 1685.)

On October 14, 2016, Plaintiff had bloodwork drawn.  (*Id*.)

On October 27, 2016, Defendant Moclock reviewed Plaintiff's abnormal labs secondary to his chronic kidney disease.  (*Id*.)

On November 1, 2016, Defendant Moclock treated Plaintiff for his chronic kidney disease.  (*Id*., p. 1684.)

On November 4, 2016, Plaintiff had additional bloodwork drawn.  (*Id*.)

On November 5, 2016, Plaintiff's labs came back abnormal, and blood rechecks were ordered.  (*Id*., pp. 1683–84)

On November 7, 2016, Defendant Moclock reviewed the bloodwork and ordered repeat labs.  (*Id*., p. 1683.)

On November 21, 2016, Defendant Moclock saw Plaintiff for his renal disorder.  (*Id*.)  That same date, Defendant Boguslaw reviewed Plaintiff's labs, and stated that he was to continue to monitor and repeat the labs.  (*Id*.)

On November 28, 2016, Defendant Moclock saw Plaintiff for his nephrology telemedicine.  (*Id*., pp. 1682–83.)

On November 29, 2016, Plaintiff had additional bloodwork drawn.  (*Id*.)

On December 1, 2016, Defendant Boguslaw reviewed Plaintiff's labs.  (*Id*.)

On December 7, 2016, Defendant Moclock reviewed an outside facility's renal ultrasound and noted it was abnormal.  (*Id*.)

On December 13, 2016, Defendant Moclock saw Plaintiff to discuss the renal ultrasound.  (*Id*., p. 1681.)

On December 27, 2016, Plaintiff had bloodwork drawn.  (*Id*.)

On December 29, 2016, Plaintiff was seen at the Chronic Clinics for hypertension and dyslipidemia.  (*Id*., pp. 1679–80.)

On January 9, 2017, Plaintiff was examined prior to his nephrology telemedicine.  (*Id*., p. 1678.)

On January 17, 2017, Defendant Boguslaw treated Plaintiff for left sided flank pain.  (*Id*.)

On January 19, 2017, Plaintiff was seen for a follow-up for his left-sided flank pain.  (*Id*., p. 1677.)

On January 23, 2017, Plaintiff attended his nephrology telemedicine appointment.  (*Id*.)

On February 16, 2017, Plaintiff had his follow-up nephrology appointment with Defendant Moclock.  (*Id*., p. 1675.)

On February 17, 2017, plaintiff reviewed Plaintiff's labs, noting that they had slightly improved.  (*Id*., p. 1674.)

On March 1, 2017, Plaintiff had additional bloodwork drawn.  (*Id*.)

On March 2, 2017, Defendant Moclock treated Plaintiff for his renal disorder.  (*Id*., p. 1673.)

From March 3, 2017 through March 5, 2017, Plaintiff was seen daily by Defendant Moclock to check a shunt in his left upper extremity.  (*Id*., pp. 1672–73.)

On March 7, 2017, Defendant Boguslaw reviewed Plaintiff's labs and treated him for his chronic kidney disease.  (*Id*., p. 1670.)

On March 9, 2017, Plaintiff was treated for a fistula.  (*Id*.)

On March 27, 2017, Plaintiff was seen in Chronic Clinics for hypertension. (*Id*., pp. 1668–69.)

On March 29, 2017, Plaintiff had additional bloodwork drawn.  (*Id*., p. 1667.)

On April 14, 2017, Defendant Moclock treated Plaintiff for his chronic kidney condition.  (*Id*., p. 1667.)

On April 28, 2017, Plaintiff was seen for seasonal allergies.  (*Id*., p. 1666.)

On May 9, 2017, Plaintiff was a no show for a sick call.  (*Id*.)

On May 22, 2017, Defendant Boguslaw saw Plaintiff for Ramadan counseling.  (*Id*.)

On June 22, 2017, Defendant Moclock Treated Plaintiff in Chronic Clinics for hypertension and dyslipidemia.  (*Id*., pp. 1663–64.)

On July 18, 2017, Defendant Boguslaw saw Plaintiff for neck pain secondary to falling and hitting the toilet two days prior.  (*Id*., p. 1662.)

On July 20, 2017, Plaintiff had his bloodwork drawn.  (*Id*.)  These were reviewed by Defendant Moclock on July 24, 2017, who noted high creatine levels. (*Id*.)

On August 1, 2017, Plaintiff had a nephrology telemedicine appointment with Defendant Moclock.  (*Id*.)

### 3.  Inadequate Medical Treatment Standard

Prison officials violate the Eighth Amendment when they act with deliberate indifference to a prisoner's serious medical needs.  *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  To sustain a constitutional claim under the Eighth Amendment for inadequate medical treatment, a plaintiff must make (1) an objective showing that his medical needs were serious, and (2) a subjective showing that the defendants were deliberately indifferent to those medical needs.  *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir.

1987) (citation omitted).  A prison official is deliberately indifferent when he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

However, "[p]rison medical authorities are given considerable latitude in the diagnosis and treatment of medical problems of inmates and courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'"  *Byrd v. Shannon*, No. 1:09-CV-1551, 2010 WL 5889519, at *4 (M.D. Pa. Nov. 24, 2010) (quoting *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979)).  Mere disagreement over proper treatment does not state a claim upon which relief can be granted.  *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *Monmouth Cty. Corr. Inst'l Inmates,* 834 F.2d at 346 ("Courts, determining what constitutes deliberate indifference, have consistently held that mere allegations of malpractice do not raise issues of constitutional import. . . Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation.").  Additionally, short delays in treatment do not rise to the level of deliberate indifference.  *See Rodriguez v. Thomas*, No. 1:CV-12-2090, 2015 WL 1470719, at *9 (M.D. Pa. Mar. 31, 2015) ("short delays unaccompanied by arbitrary or unduly burdensome bureaucratic procedures" do not rise to the level of deliberate indifference).

### 4. Application of Standard to Plaintiff's Claim

Here, the evidence demonstrates that Plaintiff presented for treatment of the left nipple discharge in June of 2015, and Defendant Boguslaw treated Plaintiff. (Doc. 60, p. 6; Doc. 60-1, pp. 305, 1631, 1699.) She ordered bloodwork, which Defendants assert were the tests necessary to determine if malignancy was present. (*Id.*) While Defendants present no evidence that the tests ordered by Defendant Boguslaw are screenings for malignancy, the court finds that this fact is immaterial because Plaintiff failed to seek additional treatment for the left nipple discharge until he appeared at triage in August of 2017. Between June of 2015 and August of 2017, Plaintiff was seen by medical professionals, including Defendants, multiple times each month. Once Plaintiff complained of continued symptoms in August of 2017, he promptly received extensive treatment from Defendants and other providers.

Plaintiff is alleging that the failure of Defendants Boguslaw and Moclock to treat the left nipple discharge between June of 2015 and August of 2017 led to pain and worsening of the cancer. (Doc. 15, p. 6.) However, the court does not find an Eighth Amendment violation when Plaintiff failed to alert medical professionals about the symptoms during his numerous medical appointments. As discussed above, for Eighth Amendment liability, medical professionals are required to have knowledge of the impairment. *Farmer*, 511 U.S. at 837. Here, Defendants were

made aware of the left nipple impairment in June of 2015, and Plaintiff received treatment, including bloodwork.  (Doc. 60-1, pp. 305, 1631, 1699.)  Following the normal results of that bloodwork, Defendants did not treat Plaintiff's left nipple discharge further until Plaintiff presented with similar symptom complaints in August of 2017.  (Doc. 60-1, p. 305.)  Plaintiff asserts that he relied on Defendant Boguslaw's assurances that there was nothing wrong with him and did not need to bring it to her attention after the initial June 22, 2015 appointment.  (Doc. 73.) Without complaint of continued symptoms from Plaintiff, Defendants had no knowledge of a continued risk to Plaintiff's health.  Furthermore, the medical records provided by Defendants appear to support a worsening of the symptoms corresponding with the August 2017 presentation to triage as Plaintiff repeatedly states a year long history of nipple discharge with a recent worsening.  (Doc. 60-1, pp. 974–75, 989.)

Plaintiff's evidence further supports a lack of knowledge by Defendants. Plaintiff filed a reply to Defendant's statement of material facts alleging the following:

> [S]ince although Ms. Boguslaw described Plaintiff's problem as chaffing caused by tight clothing, and told Plaintiff there was nothing wrong with him.  She also ordered testing that suggested the possibility of breast cancer.  Ms. Boguslaw's only instruction was to keep the area clean, she did not instruct the Plaintiff to return if the problem continued."

(Doc. 72, pp. 1–2.)  He then cites to his affidavit as evidence.  (*Id.*, p. 2.)  This affidavit states that "Plaintiff did not make any complaint about the continued symptoms until August, 2017.  [A]nd, the symptoms did continue, but Plaintiff, relying on Ms. Boguslaw's assurances did not think there was any need to bring these symptoms to her attention."  (*Id.*, p. 7.)  Here, Plaintiff's affidavit establishes that Defendants had no knowledge of the continuing symptoms between June of 2015 and August of 2017.  Therefore, Plaintiff cannot succeed on an Eighth Amendment claim, and the court will grant Defendants' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the court will grant Defendants' motion for summary judgment, enter judgment in favor of Defendants, and close this case.

An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September 12, 2023